IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| *In re:*<br><br>BATAA/KIERLAND LLC,<br><br>Debtor. | Case No.  2:14-cv-00596-PHX-JWS<br><br>MEMORANDUM DECISION |
| JPMCC 2007–CIBC 19 EAST<br>GREENWAY, LLC,<br><br>Appellant,<br><br>vs.<br><br>BATAA/KIERLAND LLC,<br><br>Appellee. | On Appeal From<br>U.S. Bankruptcy Court, District of Arizona<br>Hon. Randolph J. Haines, Judge<br>Bankruptcy Case No. 2:11-bk-05850-MCW |

JPMCC 2007–CIBC 19 East Greenway, LLC timely appeals from the order of the bankruptcy court confirming the Plan of Reorganization proposed by Debtor Bataa/Kierland LLC (hereinafter "Plan").  The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157(a), (b)(2)(A) and 1334.  This Court has jurisdiction under 28 U.S.C. § 158(a)(1), (c)(1)(A).

Dean C. Waldt and Andrew A. Harnish of Ballard Spahr LLP, Phoenix, Arizona, appeared on behalf of the Appellant JPMCC 2007–CIBC 19 East Greenway, LLC .

John J. Hebert and Philip R. Rudd of Polsinelli PC, Phoenix, Arizona, appeared on behalf the Appellee Bataa/Kierland LLC.

The court has determined that the facts and legal arguments are adequately presented in the briefs, and oral argument would not significantly assist in the resolution

of the issues presented on appeal.  Accordingly, the requests for oral argument are

denied, and the matter is submitted for decision on the briefs.[1]

## I.  BACKGROUND/ISSUES PRESENTED

Once again this court must address the proposed plan of reorganization in this

case.[2]  Accordingly, the parties are familiar with the facts, and they are not repeated

herein except to the extent necessary to an understanding of this decision.

Bataa/Kierland LLC (hereinafter "Debtor") filed a petition for bankruptcy relief under

Chapter 11 of the Bankruptcy Code.  After holding a hearing, the bankruptcy court

confirmed the plan of reorganization proposed by Debtor over the objections of JPMCC

2007–CIBC 19 East Greenway, LLC (hereinafter "JPMCC").  JPMCC appealed from the

confirmation order, this court vacated the decision of the bankruptcy court and

remanded for further consideration consistent with the court's decision.[3]  On remand,

after Debtor amended the plan, the bankruptcy court confirmed the amended proposed

plan over the objections of JPMCC.  JPMCC has timely appealed from that order.[4]

As relevant to this appeal, in vacating the first confirmation order and remanding

in *Bataa/Kierland II*, this Court specifically held that:  (1) the holding by the bankruptcy

---

[1] Fed. R. Bank. P. 8012.

[2] *In re Bataa/Kierland, LLC*, 496 B.R. 183 (D. Ariz. 2013) ("*Bataa/Kierland II*").  Other aspects of the case have also been the subject of appeals:  *see In re Bataa/Kierland, LLC*, Case No. 2:12-cv-01696-JWS ("*Bataa/Kierland I*"); *In re Bataa/Kierland, LLC*, Case No. 2:13-cv-00179-JWS (*Bataa/Kierland III*); and *In re Bataa/Kierland, LLC*, Case No. 2:13-cv-02340-JWS, consolidated with Case No. 2:13-cv-02341-JWS ("*Bataa/Kierland IV*").

[3] *Bataa/Kierland II*.

[4] At Docket 18 this Court requested the parties address the question of the impact of the pending appeal in *Bataa/Kierland IV* on this Court's jurisdiction in this appeal.  In response at Docket 19 the parties opined that the appeal in *Bataa/Kierland IV* has no effect on the jurisdiction of this Court in this appeal.  This Court agrees.

court that Debtor was required to reimburse Kierland II for part of the construction costs of the parking garage was unsupported by the evidence; (2) any claim that Kierland II had for the costs of erecting the parking garage should have been disallowed or, even if properly allowed, allowed as an unsecured claim; (3) re-characterization of the $14.9 million pre-petition transfer by Debtor to Kierland II was unsupported by the evidence; (4) questioned the treatment of $729,467.44 in net cash collateral proceeds; and (5) remanded for redetermination of the common expenses, if any, Debtor was required to reimburse Kierland II for the use of the parking garage.  No further appeal was taken from that decision.

Upon remand, JPMCC moved in the bankruptcy court for an order converting the case to a Chapter 7 case and, concurrently therewith moved separately for relief from the automatic stay.  The bankruptcy court denied both motions, and JPMCC appealed to this court.  In *Bataa/Kierland IV* this Court affirmed the decision of the bankruptcy court to the extent that it denied the motion to convert; and reversed to the extent it denied the motion for relief from the automatic stay, remanding for reconsideration consistent with this Court's decision.[5]  Debtor has appealed from that Order.[6]

Debtor filed a document entitled "Notice of:  (1) Amendment to Proposed Parking Agreement; and (2) Amendment to Amended Plan of Reorganization dated September 2, 2011."  The amendment of the plan was limited to increasing the amount of the new capital contribution from $350,000.00 to $550,000.00.[7]  As relevant to this

---

[5]  *Bataa/Kierland IV*, 2:13-cv-02340-JWS, Docket 39.

[6]  *Id.*, Docket 41.

[7]  Docket 10-5 at 171–184.

appeal, the bankruptcy court confirmed the plan as amended, finding: (1) after deducting the value of the parking on Kierland II property that the value of Debtor's real property was $13.9 million; (2) declined to approve or disapprove the Parking Agreement; and (3) that Debtor did not have any ownership interest in or possession of the $14.9 million transferred from Debtor to Bataa Oil.[8]

On appeal, JPMCC raises fifteen issues:

1.      Whether the bankruptcy court erred by entering the Confirmation Orders and confirming the Amended Plan in non-compliance with the mandates of this court set forth in the District Court Confirmation Decision and the District Court Reversal Decision;

2.      Whether the bankruptcy court erred by confirming the Amended Plan, which incorporates the Amended Parking Agreement, and reducing the value of the Property by the cost to Debtor of the Amended Parking Agreement, thereby reducing Appellant's allowed secured claim in that amount, while simultaneously holding that the bankruptcy court did not "approve" the Amended Parking Agreement to bypass the mandate of this court in the District Court Reversal Decision;

3.      Whether the bankruptcy court erred by determining that the value of the Property is $13.9 million, which included an express deduction in value for the net present value cost to Debtor of the Amended Parking Agreement, in disregard of the mandate of this court in the District Court Reversal Decision.

---

[8] Docket 10-5 at 798–806.

4.      Whether the bankruptcy court erred by confirming the Amended Plan without ruling on whether the Amended Plan meets the requirements of Section 1129(a)7 (other than feasibility under Section 1129(a)(11)), and specifically declining to apply the requirements of Section 1129(a), including but not limited to, the good faith requirement of Section 1129(a)(3), the best interest of creditor test of Section 1129(a)(7) or the requirement of acceptance of at least one impaired class of Section 1129(a)(10);

5.      Whether the bankruptcy court erred by confirming the Amended Plan that violates Section 1129(a)(3) because it was not proposed in good faith;

6.      Whether the bankruptcy court erred by confirming the Amended Plan that violates Section 1129(a)(7) because it fails the best interest of creditors test;

7.      Whether the bankruptcy court erred by confirming the Amended Plan that violates Section 1129(a)(10) because Appellant is the only remaining creditor for purposes of confirmation and Appellant affirmatively objects to the Amended Plan;

8.      Whether the bankruptcy court erred by finding that the Amended Plan was feasible under Section 1129(a)(11);

9.      Whether the bankruptcy court erred by confirming the Amended Plan that violates the absolute priority rule of Section 1129(b)(2)(B) without satisfaction of the judicially created "new value" exception to the absolute priority rule;

10.     Whether the bankruptcy court erred when finding that by increasing the proposed new value contribution of Bataa Oil, LLC ("Bataa Oil") from $350,000 (an amount which was found by this court in the District Court Confirmation Decision to be *de minimis* as a matter of law) to $550,000 the contribution was no longer *de minimis*;

11.     Whether the bankruptcy court erred by finding that Debtor satisfied the five requirements of the new value exception to the absolute priority rule in accordance with the mandates of this court under the District Court Confirmation Decision and the District Court Reversal Decision;

12.     Whether the bankruptcy court erred by finding that the proposed $550,000 new value contribution by Bataa Oil, LLC was "new" in light of the mandates of the District Court Confirmation Decision and the District Court Reversal Decision, absent any substantial new evidence presented by Debtor to meet the burden of proof established by this Court;

13.     Whether the bankruptcy court erred by finding that Appellant's security interest in the $14.9 million transferred from Debtor to Bataa Oil established by the District Court has no effect on the amount of Appellant's allowed secured claim because such funds were not owned or possessed by Debtor at the time of the confirmation of the Amended Plan;

14.     Whether the bankruptcy court erred by finding, by a preponderance of the evidence, without citing to any new evidence, that the $14.9 million recharacterization of the accounts receivable due to Debtor from Bataa Oil, on the eve of bankruptcy as an equity distribution was proper; and

15.     Whether the bankruptcy court erred by failing to reconsider the Stay Relief Motion as required by the District Court Reversal Decision, and upon such reconsideration, grant Appellant stay relief under Section 362(d).

## II.  STANDARD OF REVIEW

A district court sitting in its bankruptcy appellate capacity reviews findings of fact for clear error and conclusions of law *de novo*.[9]  The bankruptcy court's findings of fact must be accepted "unless the court is left with the definite and firm conviction that a mistake has been committed."[3]  "Mixed questions of fact are reviewed de novo."[4] The interpretation of a contract is governed by Arizona law and is reviewed *de novo*.[5] A bankruptcy court's determination of whether a proposed plan of reorganization is feasible, i.e., not likely to be followed by liquidation or further reorganization, is one of fact reviewed for clear error.[6]

This case returns to this court after remand.  On remand, the bankruptcy court was limited by two rules:  the law of the case and the rule of mandate.  It is well established that once a case has been decided by a higher court on appeal and remanded to the trial court, whatever was before the appellate court and disposed of by its decision, is considered to be finally settled.  The lower court is bound by that decision as the law of the case and must follow it according to the mandate.  The lower court may not, directly or indirectly, examine or otherwise vary or depart from any matter decided by this court in *Bataa/Kierland II*, except to the extent to resolve that

---

[9] *In re JTS Corp.*, 617 F.3d 1102, 1086–87 (9th Cir. 2010) (citing *In re Strand*, 375 F.3d 854, 857 (9th Cir. 2004)).

[3] *Id.* (quoting *In re Greene*, 583 F.3d 614, 618 (9th Cir. 2009) (internal quotation marks omitted)).

[4] *Id.* (quoting *In re Chang*, 163 F.3d 1138, 1140 (9th Cir. 1998) (internal quotation marks omitted)).

[5] *Starrag v. Maersk, Inc.*, 486 F.3d 607, 611 (9th Cir. 2007).

[6] *Harbin v. IndyMac Bank, FSB* (*In re Harbin*), 486 F.3d 510, 517 (9th Cir. 2007).

which has been remanded.  The rule of mandate does not, however, affect those matters the higher court did not decide.  Therefore, this court must distinguish between matters that were finally decided by it in *Bataa/Kierland II*, which are beyond the jurisdiction of the bankruptcy court, and those that were not.[7]  The bankruptcy court had discretion to depart from the law of the case if:  "1) the first decision was *clearly erroneous;* 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result."[8]  None of those conditions are present in this case.

## III.  DISCUSSION

### A.  *Appraised Value*

In its decision, the bankruptcy court found:

> Therefore based on all of the evidence presented in this and the prior confirmation trial, as well as the two District Court opinions and the recorded CC&Rs, the Court finds and concludes that the only evidence of the current "as is" value of the Debtor's real property is the opinion of Debtor's expert on the assumption that the Parking Agreement is effective. Therefore the Court finds and concludes that the current value of the real property is $13.9 million.[9]

To that the bankruptcy court added $400,000.00 for the cash collateral on hand at the time of confirmation for a total value of the secured claim of $14.3 million.[10]

---

[7] *United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir. 2000) (citing and quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 256 (1895)).

[8] *United States v. Cuddy*, 147 F.3d 1111, 114 (9th Cir. 1998).

[9] Docket 10-5 at 801.

[10] *Id.* at 803.

It is undisputed that at the time of the confirmation hearing the appraised value of the Debtor's property, without deduction for parking, was at least $18,118,815.[11] Debtor's appraiser then reduced that value by $4.4 million, resulting in a rounded value of $13.7 million.[12]

It is undisputed that prior to the time it was subdivided 415 surface parking spaces were located on the parcel transferred to Kierland II.[13]  In *Bataa/Kierland II* both the bankruptcy court and this court further held that Debtor was entitled to use the pre-existing parking spaces without further payment to Kierland II, the difference being that this court deducted the number of surface parking spaces that existed prior to construction of the parking garage from the number of spaces Debtor required in the parking garage.[14]  After construction of the parking garage, there were at least 76 parking spaces on Debtor's property and 206 surface parking spaces on Kierland II property.

In declining to approve or disapprove the parking agreement, the bankruptcy court held:

> This Court is neither approving the Parking Agreement nor determining how many spaces the Debtor may use under the CC&Rs, nor determining what a "fair" parking agreement would provide.  Those are

---

[11]  Docket 10-5 at 664–65, 667–69 (testimony of Dennis P. Farr, the NAI appraiser retained by Debtor).  The City of Phoenix set the appraised value "as-is" at $18.5 million.  Docket 10-5 at 680 (testimony of Kaja Farnsworth, Senior Appraiser in the Phoenix office).

[12]  Docket 10-5 at 664.  The record does not reflect the reason for the $200,000 difference between the appraiser's testimony and the bankruptcy court's finding.  That difference is, however, irrelevant to the issues presented on this appeal.

[13]  *Id.* at 676.  The court further notes that this evidence was not in the record at the time *Kierland II* was decided.  496 B.R. at 193.

[14]  *Kierland II*, 496 B.R. at 193.

either business issues for the reorganized debtor, or perhaps the subject of litigation with Kierland II (and possibly Bankers Trust).  They are not for this Court to decide, on this record.

> The only relevance of the Parking Agreement is whether it provides sufficient assurance to a prospective buyer of adequate parking, at a fair cost, so that the prospective buyer would be willing to pay as much as it would for a building that owned its own adequate parking.  So only the expert witnesses, but not this Court, were required to come to some conclusion as to the propriety and fairness of the Parking Agreement, as it would be viewed by the market of prospective buyers.  The Debtor's expert opined that the Parking Agreement was not only appropriate but would be required by any prospective buyer.  The Creditor's expert provided no testimony or evidence to the contrary, and certainly provided no testimony or implication that the Parking Agreement would be viewed by the market as somehow improper.[15]

It appears undisputed that the $18.1 million valuation is dependent upon the existence of the availability of adequate parking for Debtor's building.  It is also undisputed that the CC&Rs created an easement for the benefit of Debtor to use the surface parking on the property conveyed to Kierland II at the time of the conveyance.  The problem is that there does not appear to be an evidentiary basis for the $4.4 million reduction in value.

The error committed by the bankruptcy court in this instance was that it declined to determine how many spaces the Debtor may use under the CC&Rs.  That was the central issue with respect to the valuation question.  Instead, the bankruptcy court relied upon the opinion of the appraisers that, on the assumption that adequate parking was not available, reduced the value by $4.4 million.[16]  The problem with the bankruptcy court's approach is that in reaching its decision it implicitly determined that

---

[15]  Docket 10-5 at 802.

[16]  In reducing the value, the appraiser assumed that the parking agreement was in effect.  Docket 10-5 at 659–663.

the CC&R's did not provide adequate parking for Debtor's property.  That is, the reduction in value was appropriate if, *and only if*, the Debtor was not entitled to adequate parking on the Kierland II property under the CC&Rs.  Thus, this court is tasked with the function of determining whether this implicit determination is correct.  For the reasons that follow, this court disagrees with the bankruptcy court.

Under Arizona law the interpretation of the CC&Rs, a contract, is a question of law reviewed *de novo* on appeal.[17]  In reversing the bankruptcy court on the issue of the scope of the CC&Rs in *Bataa/Kierland II*, this court held:

> As this court understands the decision of the bankruptcy court, it interpreted the easement created by the CC & Rs as being limited to the surface parking spaces on the Kierland II property, but that easement did not extend to the additional parking in the parking structure based on its finding that the CC & Rs were not ambiguous on this point.  However, because this court finds that an ambiguity existed, resolution of that ambiguity is a factual determination to be resolved by the trier of fact on remand.[18]

Unfortunately, the bankruptcy court did not address this issue, nor does it appear that Debtor, the party who presumptively has the extrinsic evidence, has presented any further evidence on the interpretation of the CC&Rs.  While remand to the bankruptcy court for the taking of additional evidence on this issue might otherwise be appropriate, the matter has already been remanded once and, despite the clear instructions of this Court, Debtor has chosen not to present any further evidence.   Accordingly, this court will resolve the issue on the basis of the existing record.

---

[17]  *See Andrews v. Blake*, 69 P.3d 7, 11 (Ariz. 2003); *Smith v. Melson, Inc.*, 659 P.2d 1264, 1266 (Ariz. 1983).

[18]  *Kierland II*, 496 B.R. at 192 (citations omitted).

11

The facts in the record are:  (1) JPMCC's predecessor-in-interest consented to the subdivision of the property, releasing its security interest in the parcel conveyed to Kierland II; (2) in transferring part of the real property to Kierland II, Debtor either reserved to itself, or was granted, an easement to use the existing parking on the parcel conveyed to Kierland II; (3) at the time of subdivision, 415 parking spaces existed on the parcel conveyed to Kierland II; (4) in developing the parcel conveyed to it, Kierland II replaced the 415 surface parking spaces with 206 surface parking spaces and 341 spaces in a parking garage; and (5) to provide adequate parking, Debtor required the use of 336 parking spaces on Kierland II property.

As noted in *Kierland II* both the bankruptcy court and this court found that Debtor was entitled to the use of the remaining surface parking spaces on the Kierland II property without further compensation to Kierland II.[19]  The only open question on remand was the right, if any, of Debtor to use the additional parking in the parking garage that it needed to meet code.  Yet, the opinion of the appraiser upon whom the bankruptcy court relied was based upon the assumption that, absent the parking agreement, *Debtor had no right to any of the parking on Kierland II property*.  This was erroneous:  Debtor indisputably had a right to use the 206 surface parking spaces on Kierland II property.  Thus, neither the assumption of the appraiser nor the bankruptcy court's reliance thereon had any evidentiary support in the record.

As noted above, in *Bataa/Kierland II* there was no evidence in the record concerning the number of surface parking spaces that existed on the Kierland II

---

[19]  *Kierland II*, 496 B.R. at 193.

property prior to construction of the parking garage.  That omission has been

eliminated.  It is undisputed that the number of parking spaces on Debtor's property,

combined with the existing surface parking on Kierland II property at the time the

property was subdivided, were sufficient to satisfy Debtor's parking requirements.  As

this court pointed out in *Bataa/Kierland II* with respect to the number of parking spaces

available prior to construction of the Kierland II building:

> [. . . .]  That number is essential to a determination of how many
> spaces would be needed in the parking garage to satisfy applicable parking
> regulations.  What the bankruptcy court appears to have overlooked is the
> fact that *until Kierland II erected the second office building there was no
> apparent necessity for additional parking, let alone a parking garage.*  This
> proposition which is at least consistent with the record suggests that the
> necessity for the construction of the parking garage might have been *solely*
> a result of the construction of the second office building by Kierland II.
>
> Bankruptcy is an equitable proceeding.  It may be equitable to require
> Debtor to reimburse Kierland II for the reasonable value of constructing
> additional parking needed to meet *Debtor's* parking requirements, it would
> not be equitable to require Debtor to contribute to the cost of erecting
> parking spaces for the use of Kierland II.  Debtor and Kierland II may be
> likened to pockets in a pair of pants owned by Bataa Oil.  It is inequitable to
> permit the transfer of funds from one pocket in a pair of pants (Debtor) to
> the other pocket (Kierland II) simply to prevent the funds from being taken
> by the person to whom they are owed (JPMCC) for the ultimate benefit of
> the owner of the pants (Bataa Oil).[20]

Neither Debtor nor the bankruptcy court took this into consideration.  The facts in the

record unequivocally establish that, prior to the construction of the Kierland II building,

Debtor was entitled to the use of 415 spaces on the parcel conveyed to Kierland II:

more than is required under the building codes.  As was noted in *Bataa/Kierland II*,

construction of the parking structure was directly connected to, and made necessary

by, erection of the Kierland II building.

---

[20] *Kierland II*, 496 B.R. at 193–94 (emphasis in the original) (footnote omitted).

The record is also devoid of any evidence that the subdivision of the parcel and transfer of a portion to Kierland II was supported by any consideration other than the CC&Rs, which granted Debtor an easement in the then existing parking spaces without any provision that Debtor had to make any further payment to Kierland II for the continued use.  This is to what JPMCC's predecessor-in-interest agreed when it released its security interest in the parcel conveyed to Kierland II.  It strains credulity beyond the breaking point to assume that any prudent lender would agree to release part of its security under circumstances that could lead to a significant reduction in the value of its security by the unilateral action of Debtor and Kierland II.  That is precisely what Debtor proposed and the bankruptcy court at least implicitly held.  Also relevant is that approval of the subdivision by the City of Phoenix was expressly conditioned upon the provision that Debtor retain adequate parking on the Kierland II property.

The court also rejects Debtor's argument based upon Kierland II's assumption that, in the absence of a parking agreement, it could in some manner restrict the access of Debtor's tenants to the parking, or otherwise interfere with the rights of Debtor's tenants to access and use the parking on Kierland II property.  If Kierland II did so it would be directly interfering with the rights of the easement holder.  By analogy, the court notes that, in this respect, the easement in question is similar to a utility easement.  That is, the subservient tenement in a utility easement cannot restrict or otherwise interfere with the right of the utility to access the easement or take actions necessarily appurtenant to the purpose of the easement.

Based upon the preponderance of the evidence, this court holds that, as a matter of law, the parking easement contained in the CC&Rs granted Debtor an

easement in the continued use of the parking spaces physically located on the Kierland II property without reimbursement for the cost of constructing the parking garage.  This holding does not, however, preclude the parties from entering into an agreement that provides for the Debtor to share in the costs associated with the operation of the parking located on Kierland II property on a *pro rata* basis according to each party's use of the parking.

In light of this court's holding, the experts' opinions to the extent they reduce the value of the Debtor's property based on the assumed lack of access to adequate parking are contrary to the facts.  As such they are not entitled to any weight or consideration.  Accordingly, this court finds the value of the property in which JPMCC has a security interest is $18,118,815.

### B. Characterization of the $14.9 Million Disbursement to Bataa Oil

In *BataaKierland II* this court specifically found that re-characterization of the $14.9 million disbursed by Debtor to Bataa Oil as a return of equity was unsupported by the evidence.[21]  In its Memorandum Decision in *Bataa/Kierland IV*, this court further directed the bankruptcy court to:

> 3.   Recognize that JPMCC has a security interest in the $14.9 million transferred from Debtor to Bataa Oil, except to the extent that Debtor establishes by a preponderance of the evidence that the transfer was properly re-characterized as an equity distribution to Bataa Oil, including, but not limited to, consideration of the extent to which treatment as a return of equity would either constitute a voidable fraudulent transfer under federal bankruptcy law, or was contrary to the otherwise applicable provisions of Arizona law.[22]

---

[21]  *Kierland II*, 496 B.R. at 194–98.

[22]  Docket 10-5 at. 853 (Memorandum Decision in *Bataa/Kierland IV*, 2:13-cv-02340-JWS).

In its order confirming the Amended Plan the bankruptcy court found:

> The District Court's Memorandum Decision also required this Court to "recognize that JPMCC has a security interest in the $14.9 million transferred from Debtor to Bataa Oil . . . ." This Order does so recognize. However, like cash collateral that has been spent prior to the confirmation trial, any such funds that were not owned by the Debtor as of the confirmation trial have no effect on the amount of the Secured Creditor's secured claim. On the record currently before this Court, this Court has no basis to recognize or determine whether the Secured Creditor has any claim against Batta [*sic*] Oil. It is undisputed, however, that the Debtor did not have any ownership or possession of the referenced $14.9 million as of the confirmation trial, and therefore it has no effect on the amount of the Creditor's secured claim.[23]

The bankruptcy court further held:

> **No Evidence of Improper Distributions**
> The Secured Creditor also apparently attempted to submit evidence of an alleged impropriety or avoidability of a few transfers made by the Debtor to Bataa Oil in 2010 and 2011. It is not at all clear to what confirmation issue the Creditor thought such evidence was relevant. There is no pending avoidance action. Even if the Creditor had an avoidance action it could file against Batta Oil, that would have no effect on its secured or unsecured claim against the Debtor.
> The only possible relevance of the Debtor having such a claim might be to demonstrate that a Chapter 7 trustee could recover such amounts from Batta Oil, which if proven might demonstrate that the Debtor's plan fails to satisfy the best interests test of § 1129(a)(7). But that confirmation requirement is not presently before this Court, because the District Court's remand was only to consider the satisfaction of the requirements of § 1129(b).
> Regardless of what relevance it might have had, the preponderance of the evidence did not establish the availability of any transfer by the Debtor to Bataa Oil. The only possible such evidence came in the expert testimony of Michael Tucker based on his review of a very small number of book entries reflecting transfers from the Debtor to Bataa Oil. But Mr. Tucker admittedly did not consider, or even apparently have any awareness of, virtually simultaneous transfers of identical amounts from Bataa Oil to the Debtor. Mr. Tucker's failure to consider the equivalent transfers from Bataa Oil to the Debtor eliminates all probative value and

---

[23] Docket 10-5 at 803–04.

credibility to his testimony and opinion that there were any avoidable transfers.[24]

The bankruptcy court clearly misconstrued the decision of this Court.  This court agrees that there is no dispute that Debtor did not have any ownership or possession in the $14.9 million itself—that is not the issue.  Nor does JPMCC make a direct claim against Bataa Oil.  Likewise, the bankruptcy court's finding regarding avoidance of the transfers in 2010 and 2011 misses the point.  *The issue was the re-characterization of the transfer of the $14.9 million as a return of equity instead of a loan from Debtor to its parent, Bataa Oil*.  If the latter, it was an asset of Debtor to which JPMCC's security interest attached.  In *Bataa/Kierland II* this court specifically found that the re-characterization of the transfers from a loan to a distribution of equity was unsupported by the evidence and remanded to allow Debtor to provide additional evidence in support of the re-characterization.

That Bataa Oil changed the characterization of the transfers to it as a return of equity on its books *post hoc* does not constitutes sufficient additional credible evidence.  It is as self-serving as the testimony of the ultimate owners, David and Anne Calvin.  Debtor did, however, introduce the testimony of two certified public accountants.

One CPA called by Debtor who reviewed Debtor's books testified that with respect to the treatment of the payments made by Debtor to Bataa Oil:

> A      Well, the conclusion is that originally if these payments are made to a shareholder and related party, if there's no documentation indicating that there is actually a loan, there's no loan document, there's no agreement to

---

[24] *Id.* at 805–06.

pay interest, there's no repayment terms, there's no maturity date, no penalty for non-repayment, it really isn't, and shouldn't be considered a loan.

Q       Okay. So if all those factors existed, the characterization, the initial characterization of those distributions as loans would be improper.  Is that your opinion?

A       Yes.

Q       Okay. Based on your review of the situation, did you reach any conclusions or opinions concerning the recharacterization of those distributions from loans to equity distributions?

A       Yes.

Q       Okay. And what was that conclusion or opinion?

A       My opinion is that was the appropriate adjustment to make, to reclassify these accounts receivable as distributions if, in fact, they're never going to be repaid and never were intended to be repaid.[25]

This testimony, while relevant to the issue of whether the transfer should have been properly booked as return of equity under generally accepted accounting principles, does not address the issue before the court in a bankruptcy case.  What Debtor overlooks is the qualification provided by the expert: "if, *in fact*, they're never going to be repaid and never were intended to be repaid."  (Emphasis added.)  As noted in *Kierland II*, Debtor introduced no evidence that establishes those facts other than the uncorroborated testimony of one of the Bataa Oil principals, Anne Calvin.  This testimony, while perhaps providing some modicum of evidentiary support for the re-characterization, must be weighed against the other evidence, or lack thereof, in the record.  When weighed against the evidence that prior to their re-characterization on the eve of the bankruptcy filing the $14.9 million was carried on Debtor's books as an account payable and on Bataa Oil's as a corresponding account receivable, the weight of this testimony pales.

---

[25] Docket 10-5 at 630–31 (testimony of Lynne Bouvea, CPA).

Debtor's reliance on the federal income tax treatment of the income of Debtor is also misplaced.  It is undisputed that Bataa Oil, a Subchapter S corporation, and its wholly-owned subsidiaries, Debtor and Kierland II, file a single, consolidated tax return.[26]  In that case, taxable income is determined by aggregating the profits and losses of the consolidated companies, with the taxable income determined by the *net* operating gain or loss, which is in turn reported on the return filed by Bataa/Oil.[27]  As a Subchapter S corporation, the taxable income (or loss) is reported on the income tax returns of the shareholders and the taxes paid on that income paid by them,[28] in this case, David and Anne Calvin.[29]  The tax treatment of distributions by Bataa Oil to its shareholders differs based upon the existence of accumulated earnings and profits and the basis in the stock.[30]  Indeed, Debtor's own witness testified that the characterization of inter-company transactions as either loans or equity distributions had no tax significance.[31]  The relevance of the treatment of the transactions in question for federal income tax purposes to the issue before the courts is unexplained and inexplicable.

The testimony of Michael Tucker, called as a witness by JPMCC, also undercuts any claim that the re-characterization was proper.  He testified that the elimination of the receivable from the balance sheet rendered Debtor insolvent as of

---

[26] *See* 26 U.S.C. §§ 1501, *et seq.*; Docket 10-5 at 620 (Bartels' testimony).

[27] 26 U.S.C. § 1552.

[28] 26 U.S.C. § 1366.

[29] Docket 10-5 at 617-19 (Bartels' testimony).

[30] 26 U.S.C. § 1368.

[31] Docket 10-5 at 622–23 (Bartels' testimony).

July 14, 2010, and continued to be so through the date the petition was filed.[32]  That testimony was uncontroverted.  In his analysis Mr. Tucker did not render an opinion, one way or the other, whether the $14.9 million adjustment for the receivable from Bataa Oil was appropriate or inappropriate.  For the purpose of his analysis he assumed it was appropriate.[33]

To the extent that the bankruptcy court rejected the testimony of Mr. Tucker, it appears to be related to the witness' testimony regarding $870,000 in payments made by Debtor to insiders (Bataa Oil and Anne Calvin) in the year preceding the bankruptcy, as reflected on the books of both Debtor and Bataa Oil, not his testimony regarding the insolvency of Debtor as early as July 14, 2010.[34]  On direct examination the inquiry was directed solely to disbursements made by Debtor to Bataa Oil and Anne Calvin; no question was posed regarding payments by Bataa Oil to Debtor.  On cross-examination Mr. Tucker was asked whether he had considered a $250,000 transaction in October 2010 reflecting the payment to Debtor by Bataa Oil, to which he responded he had not.[35]  Whether the witness considered payments made by Bataa Oil to Debtor prior to the year immediately preceding the filing to the issue of payments made during that year, a matter on which he was not asked to testify on direct, hardly reflects upon his credibility concerning the transfers made during that year.

---

[32]  Docket 10-5 at 425–431.

[33]  Docket 10-5 at 428–29.

[34]  Docket 10-5 at 431–33.

[35]  Docket 10-5 at 453–54.

He was also questioned about a February 2011 check from Debtor payable to Bataa Oil in the amount of $200,000.[36]  Clearly, because it was not asked, Mr. Tucker did not consider this in his direct testimony.  As noted above, on direct examination, the witness was only asked about transfers from Debtor to Bataa Oil during that year, not transfers from Bataa Oil to Debtor.  At most, his testimony on cross reduces the net amount of the transfers made from Debtor to insiders by $200,000: net $670,000.  This is hardly the "equivalent amount" found by the bankruptcy court.  Based upon this record, the bankruptcy court clearly erred in rejecting the testimony of Mr. Tucker.

While this court agrees that, to the extent these transfers were fraudulent, JPMCC should have brought an adversary proceeding to avoid them; the failure to do so does not necessarily render that evidence irrelevant to the confirmation process.  It is clear that Bataa Oil (or its shareholder, Anne Calvin) realized $670,000 in presumptively fraudulent transfers during the year preceding the filing.  The amended plan confirmed by the bankruptcy court provides for an additional contribution of "new value" in the amount of $550,000.  How a contribution of an amount *less than* the sum the evidence establishes was improperly withdrawn from Debtor by its principals within the year immediately preceding the filing can constitute "new value" under the principles of equity is also unexplained and inexplicable.[37]

This court also directed that, on remand, consideration be given to the effect of Arizona law on the transfers in question.  Neither the parties nor the bankruptcy court

---

[36]  Docket 10-5 at 454–57.

[37]  The court notes that, in light of its decision regarding the value of the real property and the treatment of the $14.9 million in disbursements from Debtor to Bataa Oil, this issue is rendered moot.

addressed the applicability or effect of Arizona law on these transfers.  This court

assumes without deciding that Arizona law would not permit an insolvent corporation

from making a distribution either in the form of dividends or in return of equity.[38]

By failing to adequately address the specific matters identified by this court in

*Kierland II*, the bankruptcy court clearly erred in reaffirming re-characterization of the

$14.9 million transferred from Debtor to Bataa Oil as a return of equity.

## IV.  CONCLUSION/ORDER

For the reasons stated in Part III above, the bankruptcy court's findings of fact

and conclusions on the matters discussed do not withstand scrutiny on the record

presented.  Weighing all the evidence, this court is left with the firm conviction that the

bankruptcy court's findings of fact on the matters upon which it relied in confirming the

plan were mistaken.

The order of the bankruptcy court confirming the Amended Plan of

Reorganization is hereby **REVERSED**, and the matter is **REMANDED** to the

bankruptcy court for further proceedings consistent with this decision.   On remand the

bankruptcy court must accept as established fact that:

1.     The value of Debtor's real property securing the claim of JPMCC 2007–CIBC 19

       East Greenway, LLC is not less than $18,118,815; and

---

[38]  In its order confirming the original plan the bankruptcy court noted:  "Given the significantly deteriorated and deteriorating real estate market in 2007, and the fact that the Debtor would still have a debt to the lender for the amount of any such distribution for which it received no valuable asset in exchange, there is a significant likelihood that the distribution rendered the Debtor balance sheet insolvent."  *Kierland II*, 496 B.R. at 196 (quoting the bankruptcy court's decision confirming the plan).

2.  Bataa Oil is indebted to Debtor in the sum of $14,900,000, in which JPMCC

    2007–CIBC 19 East Greenway, LLC has a security interest.

    The Clerk of the Court is directed to enter judgment accordingly.[39]

    DATED: August 28, 2014.


                                        /s/ JOHN W. SEDWICK
                            SENIOR UNITED STATES DISTRICT JUDGE

---

[39] Fed. R. Bank. P. 8016(a).